UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARK UNGER,

        Petitioner,

                                  Case No. 14-cv-11562

v.

                                  HON. MARK A. GOLDSMITH

DAVID BERGH,

        Respondent.

_____/

**OPINION & ORDER**
**DENYING PETITION FOR WRIT OF HABEAS CORPUS, AND GRANTING**
**CERTIFICATE OF APPEALABILITY**

Petitioner Mark Unger, currently confined at the Thumb Correctional Facility in Lapeer, Michigan, filed a petition for a writ of habeas corpus, through his counsel, pursuant to 28 U.S.C. § 2254 (Dkt. 1), challenging his conviction in the Benzie County Circuit Court for first-degree premeditated murder in the death of his wife, Florence Unger. He is serving a term of life imprisonment without the possibility of parole.

The petition raises two claims: (i) the state court unreasonably applied clearly established Federal law when it held that Petitioner's trial counsel provided effective assistance in his handling of expert-witness testimony; and (ii) the state court's decision denying Petitioner's claim that trial counsel was ineffective in failing to object to numerous instances of prosecutorial misconduct was both contrary to, and an unreasonable application of, clearly established Federal law.

For the reasons explained below, the Court denies the petition, but grants Petitioner a certificate of appealability.

**I. BACKGROUND**

The Michigan Court of Appeals provided this overview of the circumstances leading to

Florence's death and Petitioner's conviction:

> Defendant was the husband of Florence Unger (also referred to as the victim). Defendant entered residential rehabilitation in late 2002 for alleged prescription drug and gambling addictions. After completing rehabilitation, however, defendant did not return to work. Florence Unger filed for divorce in August 2003.
>
> Notwithstanding the pending divorce proceedings, defendant traveled to the Watervale resort area on Lower Herring Lake with his wife and two children on October 24, 2003. The family arrived sometime in the afternoon and settled into the cottage that they had rented for the weekend. Not far from the cottage was a boathouse. On the roof of the boathouse was a wooden deck, where vacationers at Watervale often congregated. However, there were no other vacationers staying at Watervale on October 24, 2003.
>
> Defendant was on the deck with the victim on the evening of October 24, 2003. Defendant told the police and several family friends that sometime after dark, the victim had asked him to go back to the cottage and check on the two children. Defendant explained that he walked back to the cottage, put the children to bed, and returned to the deck. Defendant told the police and several friends that the victim was not on the deck when he returned, but that he presumed that she had gone to speak with one of the neighbors. Defendant maintained that he then returned to the cottage and fell asleep watching a movie.
>
> The following morning, defendant called neighbors Linn and Maggie Duncan. Defendant informed the Duncans that Florence had never returned to the cottage on the previous night. The Duncans got dressed and went outside to help defendant search for his wife. Linn and Maggie Duncan went toward the boathouse and discovered Florence Unger dead in the shallow water of Lower Herring Lake. It appeared that she had fallen from the boathouse deck. After finding the body, Linn Duncan came up from the boathouse and walked toward the cottages. Duncan met up with defendant in front of the cottages. According to Duncan, "I touched [defendant] on the chest" and said, "Mark, you're not going to like it. She is in the water." Duncan testified that defendant then "went ballistic," started "crying and screaming and hollering," and "went diagonally down to the water and jumped right in, right next to [the victim's

body]." Duncan testified that it was not possible to see the victim's body from the location where he had met defendant because the view of the lake was blocked by bushes and trees. Duncan also testified that he had not given defendant any information whatsoever about the precise location of the victim's body.

Maggie Duncan called 911 and the police arrived at the scene. About 12 feet below the surface of the rooftop deck, an area of concrete pavement extends from the boathouse wall to the edge of Lower Herring Lake. The police observed a large bloodstain on the concrete pavement. Also found on the concrete pavement were one of the victim's earrings, one or two candles, a broken glass candleholder, and a blue blanket. There was no trail of blood between the bloodstain on the concrete and the edge of the lake. The railing surrounding the rooftop deck was noticeably damaged and was bowed out toward the lake.

Upon arriving at the cottage, the police noticed that defendant had already packed his vehicle and seemed eager to leave Watervale with his two sons. The police obtained a warrant to search the vehicle and the interior of the cottage. Among other things, the police recovered a pair of men's shoes from the vehicle. On one of the shoes was a white paint smear. The white paint was tested and was found to be chemically consistent with the white paint on the railing of the boathouse deck.

Defendant was arrested and charged with first-degree premeditated murder. At the preliminary examination, Dr. Stephen D. Cohle testified that the victim had died of traumatic brain injuries sustained upon impact with the concrete pavement. In contrast, Dr. Ljubisa J. Dragovic opined that the victim had not died from head injuries sustained upon impact with the concrete, but had drowned after being dragged or moved into Lower Herring Lake. The district court excluded Dr. Dragovic's opinion testimony and determined that there was no admissible evidence of premeditation. Defendant was therefore bound over for trial on a charge of second-degree murder.

Unlike the district court, the circuit court ruled that Dr. Dragovic's expert testimony was admissible. Accordingly, the circuit court allowed the prosecution to amend the information and to reinstate the charge of first-degree premeditated murder. The case proceeded to trial. The prosecution argued that defendant had kicked or pushed the victim over the railing, and had then moved the victim from the concrete pavement into the

> lake in an effort to drown her. The prosecution relied heavily on
> the testimony of Dr. Dragovic and other expert witnesses. In
> response, the defense maintained that the victim's death had been
> accidental and that the victim had died of traumatic brain injuries
> nearly immediately upon striking the concrete. The defense
> presented expert testimony to support its theory that the victim
> had accidentally fallen over the railing and had rolled, bounced,
> or otherwise inadvertently moved into the lake. After an
> extensive trial, the jury convicted defendant of first-degree
> premeditated murder. He was sentenced to life in prison without
> parole.

People v. Unger, 749 N.W.2d 272 278, 281-282 Mich. App. 210, 213-216 (Mich. Ct. App.

2008) (footnotes omitted). The Court addresses further relevant testimony below.

Petitioner was tried by a jury in Benzie County Circuit Court. Following a jury trial

lasting twenty-six days, he was convicted of first-degree premeditated murder and, on July 18,

2006, sentenced to mandatory life imprisonment without parole.

Petitioner filed an appeal of right in the Michigan Court of Appeals, raising nine claims

for relief, including these claims: (i) the prosecutor committed misconduct by claiming that the

defense attorneys asked their experts to lie, attacking the credibility of defense experts based

on their fees, and by arguing, without record support, that bodies do not bounce; and (ii)

defense counsel was ineffective in failing to object to the prosecutorial misconduct. Petitioner

also filed a pro-per supplemental brief raising several claims of ineffective assistance of

counsel, none of which is relevant to the pending petition. The Michigan Court of Appeals

affirmed Petitioner's conviction. Id. at 306.

Petitioner then filed an application for leave to appeal in the Michigan Supreme Court,

raising the same claims raised in the Michigan Court of Appeals and eight additional claims,

none of which is relevant to this petition. The Michigan Supreme Court denied leave to

appeal. People v. Unger, 769 N.W.2d 186 (Mich. 2008).

Petitioner then filed a motion for relief from judgment in the trial court, raising six claims for relief: (i) the jury foreperson was biased, decided the case prior to start of deliberations, discussed case with other jurors prior to state of deliberations, and brought extraneous matters into the deliberative process, and the bailiff developed an improperly close relationship with jurors; (ii) newly-discovered evidence shows that key prosecution expert witness relied on junk science; (iii) trial counsel was ineffective in the handling of Paul McKeever's expert testimony; (iv) the prosecution failed to provide discovery regarding a key piece of evidence and failed to produce lab technicians who performed certain tests; (v) appellate counsel was ineffective in failing to raise outcome-determinative claims on direct review; and (vi) the results of polygraph test should be considered in deciding the motion for relief from judgment. After holding an evidentiary hearing over three days, the trial court issued an oral opinion and a subsequent supplemental written opinion denying the motion. See generally 1/11/2013 Ginther Hr'g Tr. (Dkt. 13-10); 2/22/2013 Supp. Op. (Dkt. 13-11).

Petitioner filed an application for leave to appeal in the Michigan Court of Appeals, arguing that (i) defense counsel was ineffective because he failed to investigate and expose lack of support for Dr. McKeever's testimony, failed to seek exclusion of that testimony, and failed to prepare the defense expert to counter that testimony; and (ii) juror errors deprived Petitioner of his right to a fair trial by an impartial jury. The Michigan Court of Appeals denied leave to appeal. People v. Unger, No. 315153 (Mich. Ct. App. Sept. 24, 2013) (Dkt. 13-15). Petitioner filed an application for leave to appeal in the Michigan Supreme Court, which was also denied. People v. Unger, 843 N.W.2d 513 (Mich. 2014). Petitioner then petitioned the U.S. Supreme Court for a writ of certiorari, but was unsuccessful. Unger v. Michigan, 135 S. Ct. 251 (2014).

Petitioner filed this habeas corpus petition through counsel, raising the following claims:

    i.    "The state court unreasonably applied clearly established federal law when it held that Mr. Unger's trial counsel provided effective assistance of counsel."

    ii.    "The decision of the Michigan Court of Appeals rejecting Mr. Unger's claim that his trial counsel was ineffective for failing to object to the prosecution's misconduct was both contrary to and an unreasonable application of clearly established federal law."

See Pet. at 43, 67.

## II. STANDARD OF REVIEW

Title 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, imposes the following standard of review for habeas cases:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —

    (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

    (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. Williams v. Taylor, 529 U.S. 362, 405-406 (2000). An

"unreasonable application" occurs when "a state-court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." Id. at 409. A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. at 411.

The Supreme Court has explained that a "federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003). Thus, the AEDPA "imposes a highly deferential standard for evaluating state-court rulings, and demands that state-court decisions be given the benefit of the doubt." Renico v. Lett, 559 U.S. 766, 773 (2010). A "state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id. at 102.

Furthermore, pursuant to § 2254(d), "a habeas court must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. Id. Habeas relief is not appropriate unless each ground that supported the state-court's decision is examined and found to be unreasonable under the AEDPA. See Wetzel v. Lambert, 565 U.S. 520, 525 (2012).

"If this standard is difficult to meet, that is because it was meant to be." Harrington, 562 U.S. at 102. Although § 2254(d), as amended by the AEDPA, does not completely bar

federal courts from re-litigating claims that have previously been rejected in the state courts, it preserves the authority for a federal court to grant habeas relief only "in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with" the Supreme Court's precedents. <u>Id.</u> Indeed, § 2254(d) "reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." <u>Id.</u> Thus, a "readiness to attribute error [to a state court] is inconsistent with the presumption that state courts know and follow the law." <u>Woodford v. Viscotti</u>, 537 U.S. 19, 24 (2002). Therefore, in order to obtain habeas relief in federal court, a state prisoner is required to show that the state-court's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." <u>Harrington</u>, 562 U.S. at 103.

A state court's factual determinations are presumed correct on federal habeas review. <u>See</u> 28 U.S.C. § 2254(e)(1). A habeas petitioner may rebut this presumption of correctness only with clear and convincing evidence. <u>Id.</u>; <u>Warren v. Smith</u>, 161 F.3d 358, 360-361 (6th Cir. 1998). Moreover, habeas review is "limited to the record that was before the state court." <u>Cullen v. Pinholster</u>, 563 U.S. 170, 181 (2011).

### III. ANALYSIS

Petitioner's two claims for habeas corpus relief allege that he received the ineffective assistance of trial counsel. First, Petitioner argues that counsel was ineffective in his handling of expert witnesses, particularly witness Dr. Paul McKeever. Second, Petitioner argues that counsel was ineffective in failing to object to the prosecutor's misconduct. Petitioner maintains that the state-court decisions denying these claims were an unreasonable application

of clearly established federal law, and that the Michigan Court of Appeals' decision on counsel's failure to object to the prosecutor's misconduct was also contrary to clearly established federal law.

An ineffective assistance of counsel claim has two components. Strickland v. Washington, 466 U.S. 668 (1984). A petitioner must show that counsel's performance was deficient and that the deficiency prejudiced the defense. Id. at 687. To establish deficient representation, a petitioner must demonstrate that counsel's representation "fell below an objective standard of reasonableness." Id. at 688. In order to establish prejudice, a petitioner must show that, but for the constitutionally deficient representation, there is a "reasonable probability" that the outcome of the proceeding would have been different. Id. at 694.

The AEDPA "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." Burt v. Titlow, 134 S. Ct. 10, 16 (2013). The standard for obtaining relief is "difficult to meet." White v. Woodall, 134 S. Ct. 1697, 1702 (2014) (quoting Metrish v. Lancaster, 569 U.S. 351, 133 S. Ct. 1781, 1786 (2013)). In the context of an ineffective assistance of counsel claim under Strickland, the standard is "all the more difficult" because "[t]he standards created by Strickland and § 2254(d) are both highly deferential and when the two apply in tandem, review is doubly so." Harrington, 562 U.S. at 105. "[T]he question is not whether counsel's actions were reasonable," but whether "there is any reasonable argument that counsel satisfied Strickland's deferential standard." Id.

**A. Expert Witness Testimony**

Petitioner maintains that the testimony of prosecution witness Dr. McKeever, an expert in forensic pathology, regarding the time interval between Florence's head injury and her death, was of paramount importance to the prosecution's case. Petitioner argues that this

testimony lacked a scientific basis and that, had counsel succeeded in excluding this testimony or adequately assailed its credibility through cross-examination or through defense expert-witness testimony, there is a reasonable probability that the outcome of the trial would have been different because this evidence bore directly on the premeditation element of first-degree murder.

According to Respondent, the record shows that defense counsel was well prepared for trial and performed sufficient investigation, that a motion to exclude Dr. McKeever's testimony would have been futile, and that counsel's cross-examination of Dr. McKeever was based upon reasonable trial strategy. Respondent further argues that defense counsel adequately prepared his own expert witness and that, in any event, Petitioner could not establish prejudice with respect to any of the alleged deficiencies.

The Court finds that Petitioner overstates the importance of the time-interval element of Dr. McKeever's testimony, and he understates the effectiveness of defense counsel's cross-examination of Dr. McKeever. Petitioner also discounts defense counsel's substantial investigation and reasoned decision to limit cross-examination of Dr. McKeever, and ignores the substantial and compelling evidence incriminating Petitioner in the murder. Thus, Petitioner has failed to show that the state court's decision was contrary to, or an unreasonable application of, Strickland.

### 1. Dr. McKeever's Testimony

Dr. McKeever testified as an expert in anatomical and neuropathology. He testified that he was a professor at the University of Michigan School of Medicine and chief of the neuropathology section of the pathology department. He reviewed Florence's autopsy photographs, as well as slides of her brain tissue, including tissue from the corpus callosum,

which is located above the brain stem.  5/17/2006 Trial Tr. at 1849-1850, 1855, 1879-1880 (Dkt. 10-7).  Several staining techniques were used on the brain tissue to determine if axonal swelling was present.  Id. at 1891.  These staining techniques included neurofilament staining ("NF") and neuron-specific enolase staining ("NSE").  Id.  Using the NF technique, Dr. McKeever found evidence of axonal swelling in the corpus callosum.  Id. at 1873, 1876.  Dr. McKeever testified that axonal swelling does not occur after death.  Id. at 1872.  And, in order for immunohistological staining to detect axonal swelling, a victim must have survived at least ninety minutes following injury.  Id. at 1872-1873.  Therefore, he opined that Florence survived for at least ninety minutes following her injury.  Id.  Dr. McKeever testified that his conclusions regarding the time between her injury and death were based upon articles published in peer-reviewed journals and collected by him in a Medline search.

On cross-examination, Dr. McKeever was questioned regarding a 2003 Japanese study, which concluded that NSE staining techniques may detect axonal swelling as early as thirty minutes after injury.  Id. at 1898.  Dr. McKeever expressed surprise at the thirty-minute time frame and indicted no familiarity with that study.  Id.

Approximately six months before trial, Dr. McKeever was deposed by defense counsel in connection with an Oakland County proceeding regarding custody of the two Unger children.  During that deposition, Dr. McKeever testified that both the NSE and NF staining showed diffuse axonal injury of the corpus callosum.  11/28/2005 McKeever Dep. at 13-14 (Dkt. 9-8).  He testified that he was unable to "pin[] down the time of death."  Id. at 57.  In accord with his trial testimony, Dr. McKeever testified that he performed Medline searches to attempt to determine how much time elapsed between the injury and death.  Id.  He found that

"with the NSE stain you could detect diffuse axonal injury 1-1/2 hours after the trauma. So that might give you some time frame perhaps." Id.[1]

## 2. <u>Ginther</u> Hearing Testimony

Following the conclusion of direct review in state court, Petitioner filed a motion for relief from judgment in the trial court, raising claims regarding counsel's handling of the expert-witness testimony. The trial court held a <u>Ginther</u> hearing over the course of four days.[2] The defense presented four witnesses — two expert witnesses, Dr. Colin Smith and Dr. Jan Leestma; one of Petitioner's trial attorneys; and his appellate attorney.

Dr. Smith testified as an expert in trauma neuropathology. As an initial matter, he provided some background on axonal function and injury. He described an axon as "a process that comes out of a nerve cell, and it is the process that carries electricity, and the nervous system functions by electrical currents passing around. . . . They're the conduits of electrical currents." 5/23/2012 <u>Ginther</u> Hr'g Tr. at 14 (Dkt. 13-2). When a trauma occurs, such as from a fall or a traffic accident, the axons become damaged and are no longer able to transmit electrical impulses. Id. at 15. This blockage results in swelling within the axon. Id. at 16. He explained that neuron-specific enolase, neurofilament, and beta-amyloid precursor protein ("B-APP"), are proteins formed along the nerve cell body and passed along the axon. Id. Stains are used to detect areas where these proteins accumulate. Id. at 16-17. Dr. Smith did not see the stains that Dr. McKeever used to assess the axon injury in this case. Id. at 18.

Dr. Smith's testimony focused on the Medline search cited by Dr. McKeever as the basis for his testimony that Florence survived for at least ninety minutes following injury. Dr.

---

[1] At trial, Dr. McKeever's testimony focused on the survival interval with respect only to a positive NF test.

[2] The final day consisted of argument and reading of the court's oral opinion.

Smith reviewed all of the Medline articles listed by Dr. McKeever, with the exception of two articles, which were written in Czech. Id. at 19. For those articles, Dr. Smith read only the abstracts, which were available in English. Id. Dr. Smith testified that none of those articles supported Dr. McKeever's conclusion that there had to be a minimum of ninety minutes of life after injury in this case. Id.

Dr. Smith's testimony on direct examination focused extensively on what was referred to as the Ogata study, a paper published in 1999. The Ogata study had been cited by Dr. McKeever at trial as supporting his conclusion that Florence survived for at least ninety minutes following injury. Dr. Smith interpreted the study to support a finding that, if you have a survival time of ninety minutes, you will see axonal injury, not that axonal staining will not be present in a shorter time frame. Id. at 21-22.

In Dr. Smith's opinion, even if Florence died within minutes of her injury, NSE testing could show a positive result for her axonal injury. Id. at 26. He also testified that the B-APP protein is the "gold standard" for identification of axonal injury. Id. at 27. Dr. Smith dismissed Dr. McKeever's use of NF staining to determine survival time, stating: "We have no literature describing in humans neurofilament expression with survival. So, it's not a stain that can be used to translate into a survival period." Id. at 28. Dr. Smith also disagreed with Dr. McKeever's characterization of the injury as diffuse axonal injury ("DAI"), finding it more consistent with focal axonal injury ("FAI"). Id. at 28-29. This distinction is important in Dr. Smith's opinion because the Medline articles cited by Dr. McKeever all concerned DAI rather than FAI. Id. at 29-30. In sum, Dr. Smith's opinion was that there is no scientific support for the opinion that Florence was alive for at least ninety minutes after injury.

Petitioner's attorney cross-examined Dr. Smith about a 2005 article he authored, entitled "The Significance of Beta-Amyloid Precursor Protein Immunoreactivity in Forensic Practice." Dr. Smith acknowledged that, in the publication, he had indicated that at least two hours survival time was need to detect axonal injury in a B-APP staining test. Id. at 61. He further acknowledged that, in two published papers he authored discussing immunohistochemical staining methods, he never stated that it was unwarranted to infer survival time from immunohistochemical staining methods. Id. at 62.

In addition, Dr. Smith conceded that the paper he relied upon to conclude that B-APP staining was superior to NF and NSE staining for determining axonal injury did not even mention NF or NSE staining. Id. at 101-102. One of the studies cited by Dr. Smith, referred to as the "Gorrie study," involved pediatric victims of motor vehicle accidents. The Gorrie study found the shortest period of survival from which axonal injury could be determined was thirty-five minutes. Id. at 137-139. Even so, Dr. Smith admitted that he previously stated in a book chapter he authored that the anatomy and physiology of pediatric patients versus adult patients makes it difficult to extrapolate pediatric findings to adults. Id. at 142.

In another published paper, Dr. Smith cited a 2007 study, the "Hortobagyi study," for the conclusion that the B-APP method failed to show injured axons when survival time was less than thirty minutes. Id. at 144. In addition, he acknowledged that the authors of the Ogata study concluded that "[w]ith the exclusion of inadequate cases, a 1.5 hour survival period is the limitation of NSE and APP immunostaining," which was in accord with Dr. McKeever's testimony. Id. at 159-160.

The defense presented a second expert witness at the Ginther hearing, Dr. Jan Leestma, as an expert in neuropathology. Dr. Leestma testified that he reviewed the abstracts from the

list of Medline articles cited by Dr. McKeever. 5/24/2012 <u>Ginther</u> Hr'g Tr. at 227 (Dkt. 13-3). He found no support in any of those articles for a claim that Florence lived for ninety minutes following her injury. <u>Id.</u> He noted that scientific papers presented a significant range of times from injury until the appearance of axonal swelling in immunohistological testing, ranging from thirty minutes to three hours. <u>Id.</u> at 229-230. He testified that the negative B-APP staining test "would . . . strongly suggest" that Florence did not live for thirty minutes following her injury. <u>Id.</u> at 237.

On cross-examination, the prosecution highlighted Dr. Leestma's lack of a clinical practice, his discredited testimony in several unrelated cases, and unprecedented criticism of his work by other neuropathologists.

In addition to the expert-witness testimony, one of Petitioner's trial attorneys and his appellate attorney testified at the <u>Ginther</u> hearing. Defense counsel Thomas McGuire testified that he was one of the attorneys on Petitioner's defense team. Robert Harrison was the lead attorney in charge of the case, and McGuire was second chair. 9/12/2012 <u>Ginther</u> Hr'g Tr. at 475 (Dkt. 13-4). McGuire took primary responsibility for the scientific testimony, including the medical testimony. <u>Id.</u> His responsibility included both determining the best way to cross-examine the prosecution's expert witnesses and prepare the defense's expert witnesses. <u>Id.</u> at 475-476. While McGuire consulted with Harrison about strategies for handling the expert witnesses, McGuire possessed ultimate decision-making power for how to proceed with expert witnesses. <u>Id.</u>

McGuire testified that he was not concerned that Dr. McKeever appeared to rely upon Medline abstracts, rather than full articles, in drawing his conclusions regarding the interval between injury and Florence's death, because the nature of the information was observational

rather than interpretive.  Id. at 485-496.  McGuire acknowledged that Dr. McKeever relied upon NSE staining during his deposition testimony regarding the interval before death, but relied only on NF staining in his trial testimony.  McGuire explained that he did not cross-examine Dr. McKeever on this apparent contradiction because he believed that Dr. McKeever's failure to mention NSE staining during his trial testimony was simply an oversight, and McGuire did not view it as an essential contradiction that was essential to the defense.  Id. at 497-498.  McGuire further explained:

> I have to tell you that I had some fear of the witness.  There was a history between him and the defense lawyers and there was a point reached in his examination when he began to be calm and reasonable, and he gave away some testimony and I wasn't interested in re-establishing any rancor with him.  He had accused myself and Mr. Harrison of harassing him at a deposition, something which was not true and didn't take place.  So I didn't trust Dr. McKeever very much and I didn't want to get into any unnecessary arguments with him. . . .  I was just nervous about his testimony.

Id. at 498.

McGuire was also questioned about Dr. McKeever's certainty regarding the ninety-minute time frame, positing that Dr. McKeever testified with far more certainty about the interval between injury and death during trial than during his deposition.  In his deposition, Dr. McKeever stated, "What I found, for instance, was that with the NSE stain you could detect diffuse axonal injury one-and-a-half hours after the trauma.  So that might give some kind of a time frame perhaps."  Id. at 484.  Petitioner's attorney argued that Dr. McKeever omitted the qualifying words ("might" and "perhaps") in his trial testimony.

During the hearing, defense counsel asked McGuire why he failed to question Dr. McKeever about this apparent solidification of his opinion.  McGuire did not agree with

counsel's suggestion that Dr. McKeever's degree of certainty as to the interval of death changed meaningfully from the deposition to the trial. The following exchange then occurred:

> Q: And you did not impeach Dr. McKeever with what I call that qualifying or limiting language from his deposition, correct?
>
> A: Not that I know of.
>
> Q: Wouldn't you regard that as an important difference between his trial testimony and his deposition testimony?
>
> A: Well, if you had some reason to think you were going to get a useful answer it might be a good question to ask, but if you're not sure or if you have some doubts about what he is going to say, I'm not sure I would ask the question.
>
> Q: . . . Isn't it fair to say that the deposition testimony on the might and possibly language in there speaks for itself and his trial testimony speaks for itself, so simply pointing out the substantial contradiction would score points for the defense?
>
> A: I have to tell you my experience with witnesses isn't quite as predictable as that. Just because he used the word might in the past or could in the past doesn't mean he's going to use it at a juncture like that. And a number of witness[es] also use an opportunity like that to clinch the case so to speak. I don't know whether he would or not, but I had to make a judgment about whether that was an appropriate question. There was a point at which we, Harrison and I, decided to ask no additional questions of the witness because we thought that while we had probed around the margins with him and did not get into the leads [sic] in the central controversy, we had scored some points and that's about as good as we were going to be able to do with him, and we decided to forego the rest of the questions that we had.

Id. at 501-503.

McGuire also testified that he and Dr. Carl Schmidt (the defense's expert in forensic pathology) each conducted Medline searches reviewing the literature on interval of death using various staining methods. Id. at 505-506. He did not have specific recollection about what he gleaned from the list of Medline abstracts relied upon by Dr. McKeever, but conceded that, as

17

he reviewed them prior to the <u>Ginther</u> hearing, he did not find any abstracts directly supporting the opinion that a positive NF stain means a decedent lived for ninety minutes following injury. <u>Id.</u> at 508-509. He agreed that it is a point he should have examined on cross-examination. But he also testified that he did not view this as a critical point for the defense because, even if the studies did not mention NF testing, the NSE testing supported a finding of ninety minutes survival time. <u>Id.</u> According to McGuire, the defense would not ultimately have benefitted from this line of cross-examination. <u>Id.</u>

Defense counsel also questioned McGuire about Dr. McKeever's reliance on a single piece of literature, the Ogata study, to support a ninety-minute survival period, and asked why McGuire failed to impeach or question Dr. McKeever on this point. McGuire responded that he used his own expert witness, Dr. Schmidt, to advance the argument that the tests relied upon by Dr. McKeever were not an accurate predictor or indicator of the interval between injury and death. <u>Id.</u> at 531-532. McGuire also explained that he was mindful of Dr. McKeever's impressive credentials and was concerned about being outmaneuvered if he pressed Dr. McKeever on this point. <u>Id.</u> Instead, he preferred to use his own expert to attack Dr. McKeever's conclusions.

McGuire also testified that he was able to place before the jury information about a Japanese study showing that the marker for NSE may be detected as early as thirty minutes following injury. <u>Id.</u> at 583. On cross-examination at trial, Dr. McKeever acknowledged that it was possible that an injured axon could conceivably be detected less than thirty minutes after injury. <u>Id.</u> at 584-585.

McGuire also testified that the defense did not ignore prosecution testimony regarding the amount of blood on the concrete apron and what it said about the amount of time Florence

remained on the apron. In response to prosecution witness Dr. Cohle's testimony that the blood stain would have taken approximately twenty or thirty minutes to accumulate, defense witness Dr. Schmidt testified that the blood could have been from an immediate discharge from Florence's nose upon impact. Id. at 591-592.

McGuire detailed the reasoning behind his selection of Dr. Schmidt as an expert witness. He observed that, in addition to having exceptional professional credentials, Dr. Schmidt possessed a down-to-earth manner, which McGuire felt would be well-received by jurors drawn from a rural county. Id. at 593.

Finally, Matthew Posner testified that he handled Petitioner's direct appeal. Id. at 601, Pg. ID 4057. He discussed the issues he raised on direct appeal and his failure to raise a claim that counsel was ineffective in the handling of expert-witness testimony. He testified that the failure to raise an issue on appeal that counsel was ineffective in this regard was not the result of trial strategy, but simply not recognized by him as an issue possibly to be raised. Id. at 619-620.

### 3. Trial Court Decision

The trial court issued an oral decision from the bench denying Petitioner's ineffective assistance of trial counsel claim and, a little over one month later, issued a supplemental written decision. The trial court's combined decision is the last reasoned state-court decision denying this claim. The Court, therefore, examines it in some detail.

In its oral ruling, the trial court recognized the conflict between Dr. McKeever's testimony that the minimum survival time based upon the immunohistological testing was ninety minutes, and Dr. McKeever's acknowledgement of a study brought to his attention on cross-examination that cited thirty minutes as the actual survival time. 1/11/2013 Ginther Hr'g

Tr. at 729. The trial court noted that, whether or not McGuire read the Ogata study, he nevertheless placed before the jury the possibility that Florence's survival time was only thirty minutes, a sufficient interval for premeditation. The trial court also recognized the manifold judgment calls a defense attorney must make at each trial, and it found McGuire's judgment calls reasonable and not prejudicial:

> [W]hat does Mr. McGuire say in his testimony? He says what all of us who dwell in courtrooms during trials for hours and hours know, there comes a point when you want to leave the other side's expert alone. You've got your own expert. You want to put in your testimony through your expert. . . . He thought he made some points around the margins with Dr. McKeever and he didn't want to – he didn't want to lose the jury. . . . [H]e consulted with Mr. Harrison, an attorney with great trial experience, and they said time to leave off that witness.

> \*      \*      \*

> [T]here are many reasons not to call an expert, including fear of bolstering the importance of the expert's testimony. There are many reasons not to push a cross-examination too far I would observe and that, in the opinion of this Court, is classic trial strategy.

Id. at 730, 737.

The trial court's supplement to its oral opinion focused on McGuire's cross-examination of Dr. McKeever at trial. The trial court found that the cross-examination "could be and likely was" viewed by the jury as a concession by Dr. McKeever that axonal injury could be detected with as little as thirty minutes of post-trauma vitality. See 2/22/2013 Supp. Op. at 7. The trial court concluded that Dr. Smith's and Dr. Leestma's citation to studies that "demonstrate a post-trauma period of vitality of thirty minutes . . . to a few hours before the axonal injury is manifest on post-mortem microscopic examination after proper staining techniques" would have been cumulative to evidence already presented to the jury supporting

the same timeframe. Id. The trial court also noted that, even if the jury accepted that Florence's survival time was twenty to thirty minutes, this was more than ample time for Petitioner to deliberate and think twice before moving her into the water. Id. at 8-9.

### 4. State Court's Application of the <u>Strickland</u> Standard

#### i. Defense counsel's review of scholarly articles

First, Petitioner argues that McGuire was ineffective in failing to read medical articles underlying Dr. McKeever's testimony.[3] McGuire testified at the <u>Ginther</u> hearing that he could not recall whether he had read all of the scholarly articles cited in Dr. McKeever's Medline search. 9/12/2012 <u>Ginther</u> Hr'g Tr. at 505-506. He also noted that defense expert witness Dr. Schmidt also reviewed Medline articles. Id. McGuire testified that he was unable to recall specifically the extent and import of his review of the Medline articles. Id. at 507-509.

The trial court, in denying the motion for relief from judgment, found it did not need to decide whether McGuire read particular articles relied upon by Dr. McKeever, because McGuire was well prepared for trial and exercised reasonable professional judgment in his cross-examination of Dr. McKeever. See 1/11/2013 <u>Ginther</u> Hr'g Tr. at 730.

While McGuire could not affirmatively recall the specifics of his Medline review, there is no support in the record for a conclusion that he did <u>not</u> read the articles. Indeed, a review of the trial court transcript and McGuire's <u>Ginther</u> hearing testimony shows that McGuire had a remarkable grasp of the complexities of the medical and scientific research in this case. Therefore, Petitioner fails to establish the factual premise for this aspect of his ineffective assistance of counsel claim.

---

[3] Respondent argues that this claim is unexhausted and, because no further avenue exists to exhaust this claim in state court, procedurally defaulted. The Court finds that this claim was fully exhausted in state court. It was raised in Petitioner's motion for relief from judgment, and on appeal to the Michigan Court of Appeals and Michigan Supreme Court. The Court, therefore, addresses the merits of this claim.

### ii. Defense counsel's decision not to move to exclude Dr. McKeever's testimony

Next, Petitioner argues that McGuire was ineffective in failing to move to exclude Dr. McKeever's testimony regarding the interval of death under Michigan Rule of Evidence 702, which provides:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Mich. R. Evid. 702.

This issue was raised for the first time in Petitioner's motion for relief from judgment. In denying the motion for relief from judgment, the trial court recognized that the parties presented conflicting testimony at the <u>Ginther</u> hearing regarding Dr. McKeever's interpretation of axonal injury studies, but did not find that Dr. McKeever's testimony was improperly admitted. Dr. McKeever reviewed the Ogata study and, based upon his professional experience, extrapolated certain conclusions regarding survival time. The trial court affirmed the legitimacy of this scientific approach. <u>See</u> 1/11/2013 <u>Ginther</u> Hr'g Tr. at 725-726.

McGuire's <u>Ginther</u> hearing testimony supported his decision not to challenge the admissibility of Dr. McKeever's testimony on this point. McGuire testified that, if he could have excluded Dr. McKeever's testimony that a positive NF stain means at least ninety minutes of post-injury survival, he did not know if he would have filed such a motion, largely because he believed that the NSE stain also supported a ninety minute survival time and, therefore, the defense would not have gained anything by excluding the NF testimony. 9/12/2012 <u>Ginther</u>

Hr'g Tr. at 511. He was also hesitant to "ask the Court to set aside what could be an afternoon's worth of inquiry into the witness for what -- the judge may not understand at the beginning of the process, but by the end he's going to say, why in the hell did you put all of us through this if it doesn't matter? I would have to think about that. I don't know." Id. McGuire then conceded that, if it was a simple motion and he knew it would be granted, he would file the motion. Id. at 511-512.

The Ginther hearing testimony proves that the filing of the motion would have been anything but simple. The testimony of the defense's two expert witnesses consumed two full days. And, more importantly, there is certainly no guarantee that the motion would have been granted. It was reasonable for McGuire to conclude that seeking to exclude Dr. McKeever's testimony on this point was not a prudent use of resources, particularly where, even if the NF testimony was excluded, Dr. McKeever's conclusion regarding the NSE staining supported much the same time frame as the NF staining. The defense, therefore, would have gained little if anything from a "victory."

Moreover, Petitioner has failed to show a reasonable probability that the result of the proceeding would have been different had his defense attorney moved to exclude Dr. McKeever's testimony. The defense's expert witnesses at the Daubert hearing were unable to identify any significant scientific research suggesting an interval of death less than thirty minutes.

Certainly, Dr. McKeever's testimony and the basis for his expert opinions were not irreproachable, but neither were the defense's two Ginther hearing expert witnesses' testimony. Dr. Smith testified that he found no support for Dr. McKeever's conclusion that Florence survived for ninety minutes following injury. However, on cross-examination, Dr. Smith

admitted that he published a manuscript in 2005, in which he stated that at least two hours of post-injury survival was necessary to obtain a positive B-APP test. 5/23/2012 Ginther Hr'g Tr. at 61. He also admitted that the paper he cited to support his conclusion that B-APP was the "gold standard" for detecting axonal injury compared B-APP testing only to ubiquitin, and never mentioned NF or NSE testing. Id. at 101-102.

Further, another study relied upon by Dr. Smith to show a positive B-APP test with a short survival time (thirty-five minutes) involved pediatric patients. Id. at 142. In a book chapter authored by Dr. Smith, he wrote that child brain injuries were significantly different from adult brain injuries, and the tissue responses are different. Id. Dr. Smith's testimony criticized, but does not discredit, Dr. McKeever's conclusions or analysis. His testimony did not show that Dr. McKeever's testimony was not reliable. Dr. Leestma's testimony similarly fails to discredit Dr. McKeever's testimony.

The Court concludes that trial counsel was not deficient in failing to move to exclude Dr. McKeever's testimony and that, even assuming deficiency in this regard, Petitioner has failed to show resulting prejudice. The trial court's denial of this claim was not an unreasonable application of Strickland.

### iii. Defense counsel's cross-examination of Dr. McKeever and preparation of defense expert witnesses

Petitioner's claims that trial counsel's cross-examination of Dr. McKeever was inadequate, and that the defense's expert witnesses were ill-prepared, are also meritless.

Petitioner argues that McGuire erred in failing to effectively cross-examine Dr. McKeever on his ninety-minute survival time testimony and that, had he done so, there was a reasonable probability of a different result. The trial court found that defense counsel's judgment calls on how far to push the cross-examination were the result of reasonable trial

strategy and that, even assuming an error, no prejudice resulted.  See 1/11/2013 Ginther Hr'g Tr. at 729-731, 736-737.  This conclusion is amply supported in the record and case law.

It is apparent that defense counsel understood the import of Dr. McKeever's testimony and balanced that against the inroads he was able to make on cross-examination.  Near the end of cross-examination, McGuire concluded that the risks of pressing further outweighed the potential benefits.  He conferred with co-counsel, who concurred in this assessment.  Nothing in the record supports a conclusion that this decision was the result of a failure to investigate, prepare, or understand the scientific basis for Dr. McKeever's testimony.

Moreover, the trial court's conclusion that no prejudice resulted from the allegedly inadequate cross-examination of Dr. McKeever was a reasonable application of Strickland.  First, the trial court noted that the evidence of Drs. Leestma and Smith was cumulative to evidence the jury heard about the possibility of a thirty-minute survival time.  And, even had the jury heard and accepted a twenty to thirty minute survival time, this was ample time to establish the element of premeditation.  The prosecution's case was not dependent upon a ninety-minute survival time.  It was dependent upon some period of survival to show that Petitioner had time to premeditate before moving Florence into the water.

Under Michigan law, the interval "between initial thought and ultimate action should be long enough to afford a reasonable man time to subject the nature of his response to a 'second look.'"  People v. Vail, 227 N.W.2d 535, 538 (Mich. 1975), overruled on other grounds by People v. Graves, 581 N.W.2d 229 (Mich. 1998).  The time for a "second look" can be "merely seconds."  People v. Johnson, 398 N.W.2d 219, 241 (Mich. 1986).  Under the circumstances in this case, it was certainly reasonable for the state court to find no prejudice from defense counsel's inability to firmly establish that the survival time was less than ninety minutes,

because even a survival time of twenty minutes would have allowed Petitioner time to take a second look.

Additionally, Petitioner fails to show that McGuire failed to provide Dr. Schmidt with copies of the Medline articles relied upon by Dr. McKeever. McGuire could not specifically recall whether he provided the Medline search results to Dr. Schmidt, though he did recall both he and Dr. Schmidt conducted their own Medline searches and that the two met to discuss the medical literature. 9/12/2012 <u>Ginther</u> Hr'g Tr. at 505-506. The Court is unable to conclude that, based upon McGuire's inability to recall the specific articles he and Dr. Schmidt reviewed and discussed, McGuire simply failed to provide or discuss these articles with Dr. Schmidt.

Dr. Schmidt's testimony, considered in its entirety, was quite beneficial to the defense. He testified that, contrary to Dr. McKeever's testimony, stain testing for axonal injury cannot be used to assess the time between injury and death. 6/1/2006 Trial Tr. at 3082 (Dkt. 10-14). He found no evidence on Florence's face or clothing that she had been dragged. <u>Id.</u> at 3087, 3093, 3099. Dr. Schmidt concluded that Florence died immediately, or shortly after, the impact. <u>Id.</u> at 3135. He criticized Dr. McKeever's use of NF and NSE staining, because these were generally considered unreliable tests to measure the interval of death. <u>Id.</u> at 3172-3175. And, as the trial court held, even if Dr. Schmidt had testified that the testing was supportive of a twenty to thirty minute survival time, that amount of time was more than sufficient time for premeditation.

### B. Prosecutorial Misconduct

Petitioner argues that trial counsel was ineffective in failing to object to repeated instances of prosecutorial misconduct, and that the Michigan Court of Appeals' opinion denying this claim was contrary to, and an unreasonable application of, <u>Strickland</u>. More

specifically, Petitioner argues that the prosecution's closing and rebuttal arguments were "full of improper attacks on the integrity of trial counsel and the defense experts; references to facts not in the record; and unlawful appeals to juror sympathy." Pet. at 26.

### 1. Challenged Arguments[4]

Petitioner points to the following arguments from the prosecutor in her closing argument:

- "By painting Florence Unger as some shopping-crazed adulteress, he hopes that you'll lose sight of the fact that a human life was senselessly snuffed out." 6/14/2006 Trial Tr. at 3568 (Dkt. 10-18).

- "I truly hope, in that jury room, that you were able to sort out what was a question, what was a deliberately loaded question, and what was the answer, or the testimony. And who said what. Don't be fooled by these types of antics. Because that's what they are, red herrings, meant to deter you from seeing what the real issues are in this case." Id. at 3615.

- Referring to defense counsel's cross-examination of Dr. Cohle as "tortured." Id.

- "So what do they do in the courtroom? They try and confuse the issue. And you've got Mr. McGuire saying, 'Well, there's some Japanese study, isn't there, where some other more sensitive stain can pick up axonal injury 30 minutes after a person is injured. . . . Well, so what? So what? That's a deliberate attempt to confuse you, it has nothing to do with this case." Id. at 3622-3623.

- The prosecutor argued that the defense used "smoke and mirrors" and "red herrings" to deflect attention away from Petitioner. Id. at 3615, 3625-3626.

- The prosecutor referred to defense witnesses who testified regarding the condition of the deck railing as "high-priced defense experts." Id. at 3604.

- The prosecutor argued that Dr. Cohle "never" mentioned that his degree of confidence that Florence died as a result of homicide was "51 percent," when, according to Petitioner, Dr. Cohle, in fact, testified to a confidence level of fifty-one percent. Id. at 3615.

---

[4] Assistant Attorney General Donna Pendergrast gave the closing argument for the prosecution, while attorney Mark Bilkovic handled the rebuttal closing argument.

Petitioner alleges that the following arguments in the prosecution's rebuttal argument were also improper:

- Regarding the testimony of Dr. Igor Paul (who constructed a video animation purportedly depicting how Florence could have migrated from the location where she fell to the water), the prosecutor imagined a conversation between defense counsel and Dr. Paul: "Hey, we got a problem, we need to you to come up with a scenario that shows this could have been an accident." Id. at 3806.

- Also regarding Dr. Paul: "[H]e did what he was paid to do. 'Doctor you've helped me before, help me again. I need an accident scenario. And I need somebody from MIT to come in with their credentials and fool this jury.'" 6/15/2006 Trial Tr. at 3810 (Dkt. 10-19).

- Estimating that Dr. Paul was likely paid $25,000 for his preparation and testimony, and observing: "Reasonable doubt at reasonable prices?" Id. at 3805.

## 2. Michigan Court of Appeals' Decision

The Michigan Court of Appeals held that trial counsel was not ineffective in failing to object to the prosecutor's misconduct. After reciting the standard enunciated in Strickland, the Michigan Court of Appeals held:

> We cannot omit mention of the fact that defendant was represented by capable defense counsel throughout the proceedings below. As an experienced attorney, lead defense counsel was certainly aware that "there are times when it is better not to object and draw attention to an improper comment." Furthermore, declining to raise objections, especially during closing arguments, can often be consistent with sound trial strategy. We will not substitute our judgment for that of counsel on matters of trial strategy, nor will we use the benefit of hindsight when assessing counsel's competence. Defendant has simply failed to overcome the strong presumption that trial counsel's performance was strategic. Nor can we conclude that, but for counsel's alleged errors, the result of defendant's trial would have been different. We find no ineffective assistance of counsel in this regard.

Unger, 749 N.W.2d at 296 (citations omitted).

## 3. AEDPA deference and de novo review

Petitioner argues that the state court's decision is contrary to, and an unreasonable application of, Strickland. First, he argues that the decision was contrary to Strickland because the state court stopped its performance analysis after determining that the decision not to object was a strategic one, without analyzing the reasonableness of that strategy as required by Strickland. Second, Petitioner argues that the state court applied the incorrect standard of review to the prejudice prong.

With respect to the first prong, the Court finds that the state court's decision was not contrary to Strickland. In reciting the standard of review, the Michigan Court of Appeals cited to cases that cited Strickland, and it noted that "[d]efense counsel is given wide discretion in matters of trial strategy because many calculated risks may be necessary in order to win difficult cases." Unger, 749 N.W.2d at 296 (citing People v. Pickens, 521 N.W.2d 797 (Mich. 1994)). The state court also observed that "declining to raise objections, especially during closing arguments, can often be consistent with sound trial strategy," and declined to substitute its judgment for that of counsel's or to review counsel's strategy with the benefit of hindsight." Id. (citing People v. Matuszak, 687 N.W.2d 342 (Mich. Ct. App. 2004)).

Reviewing its opinion in its entirety, it is clear that the state court concluded that the strategy was a reasonable one and was not allowing "strategy" to be used as a "talisman that necessarily defeats a charge of constitutional ineffectiveness." Cone v. Bell, 243 F.3d 961, 978 (6th Cir. 2001), rev'd on other grounds, 535 U.S. 685 (2002). The Michigan Court of Appeals applied the proper standard of review to Strickland's first prong and concluded that counsel's conduct was based upon reasonable trial strategy. Accordingly, the decision was not contrary to Strickland's first prong and AEDPA deference applies to the deficiency prong.

The Michigan Court of Appeals' decision with respect to the prejudice prong is contrary to Strickland. The state court, although not specifically citing Strickland, again cited cases that correctly state the Strickland standard. However, the Michigan Court of Appeals ultimately found no prejudice because Petitioner failed to show that "but for counsel's errors, the result of [his] trial would have been different." Unger, 749 N.W.2d at 296. Thus, the state court required Petitioner to show not just a "reasonable probability," but an absolute certainty that the outcome of the proceedings would have been different. This is clearly a higher standard than Strickland's "reasonable probability standard." See Magana v. Hofbauer, 263 F.3d 542, 550 (6th Cir. 2001).

Holding Petitioner to this more rigorous standard is contrary to clearly established Supreme Court precedent. Id.; see also Martin v. Grosshans, 424 F.3d 588, 592 (7th Cir. 2005) (holding that a state court's use of a "but for defense counsel's unprofessional errors, the result of the proceeding would have been different" standard was contrary to federal law); United States v. Day, 969 F.2d 39, 45 n.8 (5th Cir. 1992) (holding Strickland's prejudice prong "does not require certainty or even a preponderance of the evidence," but only a "reasonable probability" that the result would be different).

When a state court's decision is contrary to federal law, the Court reviews the merits of the claim de novo. Dyer v. Bowlen, 465 F.3d 280, 284 (2006). The Court will analyze the prejudice prong of this ineffective assistance of counsel claim de novo.

### i. Performance prong

The Michigan Court of Appeals held that Petitioner failed to satisfy Strickland's performance prong. As discussed above, the state court's decision in this regard is entitled to AEDPA deference.

"[S]crutiny of counsel's performance must be highly deferential." <u>Strickland</u>, 466 U.S. at 689. Petitioner has not presented any evidence to rebut the presumption that counsel's failure to object to the prosecutor's remarks during closing and rebuttal argument constituted sound trial strategy. Indeed, the Court is reluctant to second-guess the judgment of counsel who has the benefit of observing and judging the atmosphere of the courtroom, as well as the demeanor of the jurors. Counsel reasonably could have concluded that the wisest course was to allow the prosecutors' arguments to proceed uninterrupted, lest the defense call unnecessary attention to the remarks. <u>See</u> <u>United States v. Caver</u>, 470 F.3d 220, 244 (6th Cir. 2006) ("[N]ot drawing attention to [a] statement may be perfectly sound from a tactical standpoint.").

Therefore, Petitioner has failed to show either that defense counsel's performance fell outside the broad range of reasonable trial conduct, or that the state court's conclusion finding no deficient performance was an unreasonable application of Supreme Court precedent.

### ii. Prejudice prong

Assuming that counsel was, in fact, deficient in failing to object to the numerous allegations of prosecutorial misconduct, habeas relief is still not warranted on this claim, because Petitioner fails to show he was prejudiced by counsel's failure to object. The Court applies a de novo standard of review to this part of the analysis. The pertinent question under <u>Strickland</u> is: has Petitioner shown "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland</u>, 466 U.S. at 694. The Court finds that Petitioner has not met this burden.

First, Petitioner argues that defense counsel was ineffective in failing to object to the prosecutor's treatment of witness Dr. Paul. The Michigan Court of Appeals held that the prosecutor's reference to the amount of money paid to Dr. Paul for his testimony was not

objectionable, because a party is "always free to argue from the evidence presented at trial that an expert witness had a financial motive to testify." Unger, 749 N.W.2d at 293. The Michigan Court of Appeals also rejected the claim that the prosecutor misstated the evidence when she argued that "[b]odies don't bounce," because the testimony of prosecution witnesses Drs. Cohle and Dragovic supported that argument. Id. at 295. Petitioner, therefore, was not prejudiced by his attorney's failure to object to the prosecutor's proper argument.

The Michigan Court of Appeals found prosecutorial misconduct in Petitioner's remaining claims, but held that Petitioner was not deprived of a fair trial. First, the court of appeals held that the prosecution committed misconduct by impugning the integrity of Dr. Paul by arguing that Dr. Paul was hired to "fool this jury" and to provide "[r]easonable doubt at reasonable prices. Id. at 295. According to the court, the prosecution's argument suggesting that defense counsel had "re-victimized" Florence during the course of trial was improper, because it appealed to the jury's sympathy for the victim. Id. at 293. The court further held that the prosecution "exceeded the bounds of proper argument" when it suggested defense counsel attempted to "fool the jury" by way of "tortured questioning," "deliberately loaded questions," and "a deliberate attempt to mislead;" attempted to "confuse" and "mislead" the jury by using "red herrings" and "smoke and mirrors;" and attempted to "deter [the jury] from seeing what the real issues are in this case." Id. at 294. The court of appeals concluded that these arguments improperly suggested that defense counsel "was trying to distract the jury from the truth." Id.[5] The Michigan Court of Appeals also found the

---

[5] The Court notes that some of these arguments have been found by the U.S. Court of Appeals for the Sixth Circuit to be permissible. See Brown v. McKee, 231 F. App'x 469, 480 (6th Cir. 2007) ("A prosecutor commenting that the defense is attempting to trick the jury is a permissible means of arguing so long as those comments are not overly excessive or do not impair the search for the truth."); United States v. Graham, 125 F. App'x 624, 634-635 (6th

prosecutor misstated the evidence when she argued that Dr. Cohle never testified that he was only fifty-one percent certain that the death was a homicide.  Id.

Nevertheless, the Court finds no reasonable probability that had counsel objected to the prosecutor's arguments, "the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694.

First, there was substantial evidence of Petitioner's guilt.  Florence was murdered just two months after she filed for divorce from Petitioner, and the weeks leading up to the murder saw heightened tensions between Petitioner and Florence as the divorce proceedings unfolded. She complained to a friend that, after she filed for divorce, Petitioner's behavior was like that of a Dr. Jekyll and Mr. Hyde.  Florence injected information regarding Petitioner's drug and gambling addictions into the divorce proceedings, threatening Petitioner's stated goal of attaining full custody of the children.  Many witnesses testified that Florence had a profound fear of the dark, such that she never would have stayed on the boathouse deck by herself while Petitioner checked on the children.  Petitioner appeared to know the location of his wife's body without having to be guided there by Linn Duncan.  Duncan observed that once Petitioner reached the water and Florence's body, Petitioner never touched her or tried to remove her from the water.  In contrast, Petitioner told a sheriff's deputy that he tried to remove Florence but blood started coming out of her, and told two of Florence's friends that he tried to remove her from the water but could not because she was too heavy.

Several witnesses also testified that, following Florence's death, Petitioner's behavior seemed histrionic; he appeared to be crying, but never shed a tear.  The prosecution presented

Cir. 2005) (prosecutor's use of the term "smoke screens" was not an improper attack upon defense counsel, but was simply a remark upon the merits of the defendant's case).

testimony that the deck railing did not give way until a force of 198 pounds was applied to it; Florence weighed only 130 pounds. Paint chips of a consistent chemical and elemental composition to the pain used on the boathouse railing was found on Petitioner's shoe. In addition, expert witnesses testified that the fall from the deck to the concrete floor below would have rendered Florence immobile and likely unconscious, so that someone else would have had to move her from where she landed to the water. Dr. Dragovic testified that Florence had abrasions to her right ear, right cheek, right arm, right elbow, right flank and right hip, consistent with being dragged across the concrete. Thus, the testimony incriminating Petitioner, while not uncontroverted, was substantial.

Second, while Petitioner points to a number of objectionable arguments, the Court takes note that the closing and rebuttal arguments together took approximately four hours. Considered in the context of the length of the arguments as a whole, the objectionable arguments comprised but a small part (both in substance and time) of the closing and rebuttal arguments.

The defense's closing argument also contained some arguments that mirrored the tone of the prosecutor's arguments. For example, defense counsel's closing argument reflected on the state's "awesome power" and the many resources it had at hand to build a case. 6/15/2006 Trial Tr. at 3710. Petitioner balks at the prosecutor's argument that Dr. Igor traded "[r]easonable doubt at reasonable prices," id. at 3805, but defense counsel similarly impugned the motives of certain prosecution witnesses. Defense counsel imagined aloud the prosecutor "at the drop of a hat" calling up the prosecution's expert witness Dr. Dragovic and saying:

> "We need a little help in this case, Doc, we'd like somebody to supply a little premeditation and deliberation, so, you know, let's form a caravan and let's go up and let's do some things, and let's

> try to talk the real pathologist involved in this case into
> something else -- to say something else."

Id. at 3710.

Defense counsel accused the State of having the power to "steamroll over anybody. You don't stand a chance in most cases because of that awesome power." Id. Defense counsel argued that the prosecution manipulated evidence and threw out red herrings. Id. at 3713, 3759. Defense counsel also personally attacked one of the prosecution's expert witnesses, Dr. Brian Zink, theorizing, with no record support, that Dr. Zink testified in order to retain his position at the University of Michigan School of Medicine:

> I also don't remember him telling us that he had written anything
> -- any research papers or textbooks, or anything like that. And I
> kind of wondered whether his presence here as an expert witness
> had anything to do with the requirements in major universities
> that persons in those kinds of positions have to do research and
> have to do writing or have to do something outside of their
> academic sphere in order to continue to maintain their
> position. . . . I wondered to myself, I wonder if this guy has to be
> here, and has to testify, in order to satisfy the requirements
> necessary to hang on to his tenured job.

Id. at 3742.

Finally, all of these objectionable arguments occurred during the prosecutor's closing and rebuttal arguments. They, therefore, did not "permeate the entire atmosphere of the trial." Pritchett v. Pitcher, 117 F.3d 959, 964 (6th Cir. 1997). The trial court also provided the following limiting instruction:

> When you discuss the case and decide on your verdict, you may
> only consider the evidence that was properly admitted in this
> case. Therefore, it is important for you to understand what is
> evidence and what is not evidence. Evidence included only the
> sworn testimony of the witnesses and the exhibits admitted into
> evidence, and anything else I told you to consider. . . . Many
> things [are] not evidence, and you must be careful not to consider

them as such.  I will now describe some of the things that are not evidence.

* * *

The attorneys' statements and arguments are not evidence. They're only meant to meant to help you understand the evidence and each side's theory of the case.

* * *

You should only accept things the attorneys say that are supported by the evidence or by your own common sense and general knowledge.

6/16/2006 Trial Tr. at 3836-3837 (Dkt. 10-20).

To establish prejudice, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. . . .  [A]nd not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." Strickland, 466 U.S. at 693.  "The assessment of prejudice should proceed on the assumption that the decision maker is reasonably, conscientiously, and impartially applying the standards that govern the decision." Id. at 695.  Given the strength of the evidence presented, defense counsels' obvious skill and preparedness throughout the proceedings, and the jury's duty to follow the court's instructions, the Court finds that defense counsel's failure to object to the prosecutor's closing argument has not undermined the Court's confidence in the outcome of the trial.

Accordingly, habeas relief is denied on this claim.

## C.  Certificate of Appealability

Before Petitioner may appeal this Court's dispositive decision, a certificate of appealability must issue.  See 28 U.S.C. § 2253(c)(1)(A); Fed. R. App. P. 22(b).  A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial

of a constitutional right." 28 U.S.C. § 2253(c)(2). When a court rejects a habeas claim on the merits, the substantial showing threshold is met if the petitioner demonstrates that reasonable jurists would find the district court's assessment of the constitutional claim debatable or wrong. See Slack v. McDaniel, 529 U.S. 473, 484 (2000). Courts must either issue a certificate of appealability indicating which issues satisfy the required showing or provide reasons why such a certificate should not issue. 28 U.S.C. § 2253(c)(3); Fed. R. App. P. 22(b); In re Certificates of Appealability, 106 F.3d 1306, 1307 (6th Cir. 1997). "The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rules Governing § 2254 Cases, Rule 11(a), 28 U.S.C. foll. § 2254; Castro v. United States, 310 F.3d 900, 901 (6th Cir. 2002).

Having considered the matter, reasonable jurists could debate the Court's conclusions with respect to the two ineffective assistance of counsel claims raised in the petition. Therefore, the Court grants Petitioner a certificate of appealability.

## IV. CONCLUSION

For the reasons stated above, the Court denies the petition for writ of habeas corpus (Dkt. 1). The Court grants a certificate of appealability for both of the claims raised in the petition.

SO ORDERED.

Dated:  August 3, 2017                    s/Mark A. Goldsmith
     Detroit, Michigan                MARK A. GOLDSMITH
                                             United States District Judge

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on August 3, 2017.

s/Karri Sandusky           

Case Manager
